**EXHIBIT A**

JEFFER MANGELS BUTLER & MITCHELL LLP
MATTHEW D. HINKS (Bar No. 200750)
*mhinks@jmbm.com*
SEENA MAX SAMIMI (Bar No. 246335)
*ssamimi@jmbm.com*
1900 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-4308
Telephone:     (310) 203-8080
Facsimile:     (310) 203-0567

Attorneys for Plaintiffs Michael Pashaie and
Shahla Pashaie

Electronically FILED by
Superior Court of California,
County of Los Angeles
4/04/2023 12:33 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By G. Robinson, Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES, CENTRAL DISTRICT

| | |
|---|---|
| Michael Pashaie; and<br>Shahla Pashaie;<br><br>        Plaintiffs,<br><br>    v.<br><br>H77LA, LLC, a Delaware Limited Liability<br>Corporation; and<br>DOES 1 through 10, inclusive,<br><br>        Defendants. | Case No. **23STCV07458**<br><br>**COMPLAINT FOR BREACH OF<br>COVENANT AND DECLARATORY AND<br>INJUNCTIVE RELIEF** |

JMBM | Jeffer Mangels
Butler & Mitchell LLP

71193439v1

COMPLAINT FOR BREACH OF COVENANT AND DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Michael Pashaie and Shahla Pashaie ("Plaintiffs") complain and allege as follows:

## I. INTRODUCTION

1.      Both Plaintiffs and Defendant H77LA, LLC ("Defendant") own adjacent properties in the cities of Los Angeles and Beverly Hills, both of which are bound by a covenant entitled "Agreement Concerning Slope Maintenance" dated October 1, 1992. (the "Covenant" attached hereto as **Exhibit 1**.)

2.      The Covenant restricts development rights on the property located at 9450 Sierra Mar Drive, Los Angeles, CA 90069 ("Defendant's Property"), in favor of the owner of the property located at 1028 Hillcrest Road, Beverly Hills, CA 90210 ("Plaintiffs' Property").

3.      Specifically, the Covenant requires that Defendant obtain Plaintiffs' "prior written approval" before Defendant makes any changes to the improvements located on Defendant's Property. Section 1 of the Covenant reads, in relevant part: "Once the improvements are constructed, [Defendant] shall not change the improvements or their color without [Plaintiffs'] prior written approval."

4.      In spite of this clear restriction, Defendant has begun construction on Defendant's Property without Plaintiffs' consent. Construction that has taken place to date includes major demolition activities, which have thus far brought the existing home down to the studs. Defendant has refused to share the most recent plans for the new construction, let alone obtain prior written approval from Plaintiffs.

5.      Notably, as to the latest set of plans that were shared with Plaintiffs, Plaintiffs communicated to Defendant, on multiple occasions, that they do not provide consent for the construction, including the construction of a proposed swimming pool that violates yet another provision of the Covenant.

6.      Plaintiffs have filed this lawsuit to compel Defendant to comply with the Covenant and to enjoin and prevent Defendant from pursuing any additional construction activities without Plaintiffs' written consent of the plans and design.

## II. PARTIES

7.      Plaintiffs Michael and Shahla Pashaie are individuals who reside in the State of

71195439v1

2

COMPLAINT FOR BREACH OF COVENANT AND DECLARATORY AND INJUNCTIVE RELIEF

1 | California, and who own the home located at 1028 Hillcrest Road, Beverly Hills, CA 90210.

2 |     8.    Plaintiffs are informed and believe that Defendant H77LA, LLC is a Delaware

3 | Limited Liability Company, doing business in Los Angeles, CA, and owns the property located at

4 | 9450 Sierra Mar Drive, Los Angeles, CA 90069.

5 |     9.    Plaintiffs do not know the true names or capacities, whether individual, corporate,

6 | associate, or otherwise of Defendants Does 1 through 10, inclusive, and therefore sues said

7 | Defendants under fictitious names. Plaintiffs will amend this Complaint to show their true names

8 | and capacities when and if the same have been ascertained. Plaintiffs are informed and believe, and

9 | on that basis allege, that each of the fictitiously named Defendants is responsible in some manner

10 | or capacity for the wrongful conduct alleged herein, and that Plaintiffs' loss as alleged herein was

11 | proximately and/or directly caused by such Defendant's acts.

12 | ### III. JURISDICTION AND VENUE

13 |     10.    The Los Angeles County Superior Court is a court of general jurisdiction and

14 | therefore has subject matter jurisdiction over this action. Further, this Court has jurisdiction over

15 | this matter because Defendant has committed the acts complained of herein entirely within the

16 | County of Los Angeles. Moreover, this Court has jurisdiction over this action given that the amount

17 | in question exceeds the jurisdictional minimum of the Court, exclusive of costs and interest.

18 |     11.    Venue is proper in this Court pursuant to California Code of Civil Procedure § 395

19 | because the actions and omissions complained of in this Complaint took place in Los Angeles

20 | County; the subject property is located in Los Angeles County; and all parties are located or do

21 | business in Los Angeles County.

22 | ### IV. FACTS COMMON TO ALL CAUSES OF ACTION

23 | **The Covenant Places Restrictions on Improvements at Defendant's Property**

24 |     12.    The Covenant is attached hereto as **Exhibit 1**, and governs the land and structures

25 | that are on the sloped portion (all areas that are not on level grade) for both Plaintiffs' Property and

26 | Defendant's Property. The Covenant was duly recorded, and all signatures from all parties (all of

27 | whom were represented by counsel) were notarized.

28 |     13.    Originally, Plaintiffs' Property and Defendant's Property were under common

JMBM | Jeffer Mangels Butler & Mitchell LLP

71195439v1

3

1   ownership. The prior owner of both lots, the Soleimanis, sold the downslope parcel (Plaintiffs'

2   Property, located in the City of Beverly Hills) to Plaintiffs, and maintained a portion of the upslope

3   property (now Defendant's Property, located in the City of Los Angeles) for themselves. After the

4   downslope parcel was sold to Plaintiffs, the Soleimanis began construction on the upslope property

5   (now Defendant's Property). That construction resulted in debris falling onto Plaintiffs' Property

6   from Defendant's Property, and other nuisances and damages related to the construction. As a result

7   of this dangerous situation, the parties halted construction and began negotiations relating to the

8   Covenant.

9       14.     One of the key purposes of the Covenant, therefore, was to ensure that Plaintiffs'

10   Property would not be negatively impacted through new dangerous construction immediately

11   upslope of Plaintiffs' Property. In this regard, the parties agreed to certain limitations relating to

12   design and construction on Defendant's Property.

13      15.     Section 1 of the Covenant provides as follows:

14   Pashaie approves the plans attached hereto as Exhibit "C" showing the location of a
     balcony to be built on the side of the house on the [Defendant's] Property and
15   retaining walls to be built below the residence (the "Plans"). The railing of the
     balcony and the retaining walls shall be painted to match the adjacent dirt. Once the
16   improvements are constructed [Defendant] shall not change the improvements or
     their color without Pashaie's prior written approval. The slope from the residence on
17   the [Defendant's] Property to the Pashaie Property shall be planted with trees and
     shrubbery and shall not now or in the future have any improvements placed thereon
18   other than the retaining walls shown on the Plans. [Defendant] shall water and
     maintain the trees and shrubbery. [Defendant] may construct a lap pool at, and
19   parallel to, the property line of the [Defendant's] Property adjacent to Sierra Mar
     Drive. The pool shall be not wider than 9 feet, not longer than 25 feet and no deeper
20   than 5 feet and shall be engineered and built to meet or exceed by 150% the City of
     Los Angeles requirements for construction of a swimming pool on a hillside."
21   (Exhibit 1, Section 1.)

22   

23      16.     Thus, the Covenant provides that once the improvements contemplated by the plans

24   that existed in 1992 were constructed, the owner of Defendant's Property may not change them

25   without Plaintiffs' prior written approval. A home was built on the Defendant's Property in 1992,

26   but no pool was ever constructed.

27      17.     The Covenant requires Plaintiffs' approval for everything that was included in the

28   plans listed in Exhibit C to the Covenant. (Exhibit 1, p. 4 [Exhibit C to the Covenant].)

18.     The intent of the parties was to cover all parts of both properties that were located on sloped land. There is only a very small portion of Defendant's Property that is not on sloped land, and that is the portion that is immediately adjacent to Sierra Mar Drive. As noted on Exhibit C, the structure itself is expressly part of the Covenant, and as such, changes to the structure are subject to Plaintiffs' written consent.

19.     The intent of the Covenant was to be broad, and even covered any potential changes of color to the Defendant's Property. Beyond Exhibit C, the text of Section 1 specifically confirms that Plaintiffs' approval includes the following items, most of which are related to the structure itself: 1) balcony and railings on the side of the house; 2) retaining walls below the residence; 3) color of the improvements facing the Plaintiffs' property; 4) the vegetation between the structures on Defendant's Property and Plaintiffs' Property; and 5) the swimming pool.

20.     Incidentally, even though the swimming pool (which was contemplated in the Covenant, but was never built) is to be located on the portion of Defendant's Property that is not entirely located on a slope, the drafters of the Covenant intended even that portion of the Property to be included within the scope of the Covenant, confirming its broad scope.

21.     The consideration Plaintiffs gave to Defendant's predecessor in interest (the Soleimanis) in exchange for the requirement to seek Plaintiffs' written approval before making any changes to "the improvements or their color," was twofold. First, Plaintiffs were allowing construction to continue on Defendant's Property with certain restrictions, even though they had the ability to block construction due to the dangerous condition and debris falling from the upslope construction. Second, Defendant's Property was given a drainage easement, which allows all of the drainage from Defendant's Property (which is up-slope from the Plaintiffs' Property) to be drained, through Plaintiffs Property. (Exhibit 1, Section 3.)

22.     The drainage easement is still in place today, meaning that all of the drainage from Defendant's Property continues to flow down from Defendant's Property, through Plaintiffs' Property, and onto the street adjacent to Plaintiffs' Property.

23.     The Covenant runs with the land, and is binding on Defendant: "The covenants contained in this agreement shall run with the land and shall be binding upon the parties to this

JMBM | Jeffer Mangels Butler & Mitchell LLP

1   agreement, and their successors and assigns during their respective periods of ownership." (Exhibit

2   1, Section 4.)

3   **Defendant Pursues Various Remodels Without Obtaining Plaintiffs' Consent**

4   24.    In 2017, Defendant pursued several entitlements in connection with a remodel of

5   Defendant's Property, all of which were denied. The Determination Letter denying the entitlements

6   for the remodel request is attached as **Exhibit 2**.

7   25.    Not only did Plaintiffs not provide written consent for the 2017 remodel attempt,

8   Plaintiffs actively opposed Defendant's entitlements before the Zoning Administrator. Defendant

9   thumbed its nose at the Covenant's requirements to seek Plaintiff's consent, and sought the

10  entitlements anyway, ultimately failing in the attempt.

11  26.    Plaintiffs are informed and believe that, subsequent to Defendant's failure to obtain

12  entitlements, Defendant changed plans for the remodel so that it could proceed as a "by right" project

13  that would not need any discretionary entitlements from the City.

14  27.    In 2017 and 2018, Plaintiffs and Defendant met several times, through their

15  representatives, in an attempt to reach mutual agreement regarding the plans to rebuild Defendant's

16  Property. Those negotiations encompassed two issues: 1) obtaining Plaintiffs' consent for the

17  improvements to Defendant's Property pursuant to Section 1 of the Covenant, and 2) effectuating a

18  grant deed from Defendant to Plaintiffs, relating to a portion of the land where Plaintiffs currently

19  enjoy an exclusive, perpetual easement, pursuant to Section 2 of the Covenant.

20  28.    Ultimately, the negotiations were not successful, in that: 1) Plaintiffs did not give

21  consent to the new remodel plan, and 2) Defendant did not provide the fee title of the portion of land

22  where Plaintiffs currently enjoy an exclusive, perpetual easement.

23  29.    After the parties failed to arrive at a negotiated agreement, Plaintiffs were informed

24  and believed that Defendant had simply abandoned plans to remodel the Property.

25  30.    Plaintiffs also temporarily abandoned their plans to effectuate a lot line adjustment

26  and obtain fee title over the easement portion of the land.

27  31.    For years, the parties took no further action relating to the construction, and after the

28  negotiations ended in 2018 with no resolution, Defendant never again approached Plaintiffs to show

JMBM | Jeffer Mangels
Butler & Mitchell LLP

71195439v1

6

1   any new plans and to obtain consent for new construction efforts.

2     32. However, Plaintiffs were surprised to arrive at Plaintiffs' Property on August 19,

3   2022, and find that Defendant had in fact begun construction at Defendant's Property. At that time,

4   construction was limited to demolition/hauling activities and grading, such that the structure located

5   on Defendant's Property was down to the studs only.

6     33. Plaintiffs have not provided any written consent to any construction activities at the

7   Defendant's Property.

8     34. Indeed, Defendant have refused to provide the new plans to the Plaintiffs, despite

9   several oral and written requests. In other words, it would be impossible for the Plaintiffs to even

10   provide consent pursuant to the Covenant, because Defendant has withheld the plans and has not

11   given Plaintiffs the opportunity to review them.

12     **Defendant Seeks to Build a Pool in Violation of the Covenant's Restrictions**

13     35. One of the restrictions in the Covenant governs the pool on Defendant's Property:

14   "[Defendant] may construct a lap pool at, and parallel to, the property line of the [Defendant's]

15   Property adjacent to Sierra Mar Drive. The pool shall be not wider than 9 feet, not longer than 25

16   feet and no deeper than 5 feet and shall be engineered and built to meet or exceed by 150% the City

17   of Los Angeles requirements for construction of a swimming pool on a hillside." (Exhibit 1, Section

18   1.) The level of specificity contemplated in the Covenant relating to the swimming pool is

19   noteworthy, and is a clear indication that the parties specifically negotiated the dimensions and

20   specifications of the pool, and intended that any pool to ever be constructed on Defendant's Property

21   would need to comply with those dimensions.

22     36. Although Plaintiffs are not in possession of the plans for the new 2022 remodel

23   (Plaintiffs have asked for the plans several times, but Defendant has refused to cooperate), the last

24   set of plans that were shared with Plaintiffs showed a swimming pool that is not compliant with

25   Section 1 of the Covenant. Specifically, the proposed pool was not parallel to Sierra Mar Drive, and

26   did not comply with the dimensions described in the Slope Maintenance Agreement.

27     37. Plaintiffs are informed and believe that the proposed pool that the Defendant intends

28   to construct on the Defendant's Property would be round with an over 30 foot diameter (i.e., not a

JMBM | Jeffer Mangels Butler & Mitchell LLP

1    9 x 25 rectangular lap pool adjacent to Sierra Mar Drive), in violation of Section 1 of the Covenant.

2    **Plaintiffs Attempt to Resolve Matter Amicably Before Filing Suit**

3    38.    After learning of the construction activities taking place at Defendant's Property,

4    Plaintiffs, through counsel, sent two cease and desist letters to Defendant's counsel, warning that

5    they would take legal action if Defendant does not comply with the terms of the Covenant. (**Exhibits**

6    **3-4**.)

7    39.    Through the letters, Plaintiffs sought copies of the plans, and asked for Defendant to

8    halt construction activities until there had been compliance with the Covenant.

9    40.    The parties also participated in a mediation on November 21, 2022, but were unable

10   to reach an agreement.

11   41.    Despite these multiple attempts at an amicable resolution, Defendant has made clear

12   that it is not interested in making changes to the design, and that it intends to proceed with the

13   construction in violation of the Covenant, and over Plaintiffs' objections.

14   42.    On information and belief, Defendant's construction activities are continuing,

15   despite 1) the lack of written consent from Plaintiffs, and 2) the failure of the swimming pool to

16   comply with the Covenant.

17

18   **FIRST CAUSE OF ACTION**

19   (Breach of Contract – Breach of Covenant against Defendant)

20   43.    Plaintiffs repeat and reallege the allegations of all Paragraphs above as though fully

21   set forth herein.

22   44.    The Covenant is contractually binding on Defendant, as owner of Defendant's

23   Property.

24   45.    Pursuant to Section 1 of the Covenant, "Once the improvements are constructed,

25   [Defendant] shall not change the improvements or their color without [Plaintiffs'] prior written

26   approval."

27   46.    Pursuant to Section 1 of the Covenant, "The pool shall be not wider than 9 feet, not

28   longer than 25 feet and no deeper than 5 feet and shall be engineered and built to meet or exceed by

71195439v1

8

COMPLAINT FOR BREACH OF COVENANT AND DECLARATORY AND INJUNCTIVE RELIEF

1   150% the City of Los Angeles requirements for construction of a swimming pool on a hillside."

2   47.   Defendant has breached, or at a minimum, have threatened breach, of the Covenant

3   due to failure to comply with these provisions of Section 1 of the Covenant.

4   48.   Plaintiffs are parties to the Covenant, and as such, have standing to enforce the

5   Covenant and seek injunctive relief.

6   49.   As a proximate result of Defendant's continuing breach of the Covenant, Plaintiffs

7   have and will continue to suffer irreparable harm through an imminent violation of the Covenant.

8   50.   Plaintiffs have no adequate remedy at law, and are therefore entitled to a temporary,

9   preliminary, and permanent injunction requiring Defendant to comply with the Covenant, and

10  abandon the proposed construction project until they have obtained Plaintiffs' written consent.

11  51.   As a further direct and proximate result of Defendant's breach, Plaintiff has had to

12  employ attorneys to bring this litigation. Plaintiff is entitled to recover its attorneys' fees and costs

13  pursuant to Section 5 of the Covenant.

14

15  **SECOND CAUSE OF ACTION**

16  (Declaratory Relief – Defendant is in Breach of Covenant)

17  52.   Plaintiffs repeat and reallege the allegations of all Paragraphs above as though fully

18  set forth herein.

19  53.   Plaintiffs are informed and believe, and thereon allege, that an actual controversy has

20  arisen between Plaintiffs, on one hand, and Defendant, on the other, concerning the interpretation

21  of the Covenant.

22  54.   Plaintiffs contend that the Covenant prohibits Defendant from making any changes

23  to the improvements on the slope portion of the Defendant's Property without first obtaining

24  Plaintiffs' written approval.

25  55.   Plaintiffs contend that the Covenant prohibits Defendant from constructing a

26  swimming pool at the property that exceeds the limitations listed in the Covenant.

27  56.   Plaintiffs are informed and believe, and thereon allege, that Defendant disputes these

28  contentions.

57.     Plaintiffs desire a judicial determination of the rights and duties of Plaintiffs and Defendant as to the above-referenced contentions. Such a declaration is necessary and appropriate at this time so that the respective rights and obligations of the parties are resolved.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

1.     For temporary, preliminary, and permanent injunctions compelling Defendant to comply with the Covenant, and prohibiting Defendant from engaging in further construction activities until they have obtained Plaintiffs' written consent.

2.     For specific performance of the Covenant;

3.     For compensatory damages, the exact amount to be determined at the time of trial;

4.     For a declaration that Defendant cannot make any changes to the improvements on any portion of the Defendant's Property that is located on a slope, unless they have first obtained Plaintiffs' written approval.

5.     For attorneys' fees and costs pursuant to the Covenant;

6.     For such other and further relief as the Court deems just and proper.

DATED:  April 4, 2023

JEFFER MANGELS BUTLER & MITCHELL LLP
MATTHEW D. HINKS
SEENA MAX SAMIMI


By: _____
              SEENA MAX SAMIMI
Attorneys for Plaintiffs Michael Pashaie and
Shahla Pashaie

# EXHIBIT 1

RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:

Michael Pashaie
9401 Wilshire Blvd., Suite 830
Beverly Hills, California 90212

COPY 92 1977528 of Document Recorded

Has not been compared with original.
Original will be returned when...

(Space above this line for Recorder's use)

AGREEMENT CONCERNING SLOPE MAINTENANCE

This Agreement is made as of October 1, 1992 between Parviz Solimani and Paricheher Solimani ("Solimani"), owner of 9450 Sierra Mar Drive, Los Angeles, California, described on Exhibit "A" hereto ("Solimani Property") and Michael Pashaie and Shahla Pashaie ("Pashaie"), owner of 1028 Hillcrest Road, Beverly Hills, California, described on Exhibit "B" hereto ("Pashaie Property"). The Solimani Property abuts the Pashaie Property and the parties wish to enter into an agreement concerning the improvements that may be placed on the slope portion of the Solimani Property.

The parties agree as follows:

1. Pashaie approves the plans attached hereto as Exhibit "C" showing the location of a balcony to be built on the side of the house on the Solimani Property and retaining walls to be built below the residence (the "Plans"). The railing of the balcony and the retaining walls shall be painted to match the adjacent dirt. Once the improvements are constructed Solimani shall not change the improvements or their color without Pashaie's prior written approval. The slope from the residence on the Solimani Property to the Pashaie Property shall be planted with trees and shrubbery and shall not now or in the future have any improvements placed thereon other than the retaining walls shown on the Plans. Solimani shall water and maintain the trees and shrubbery. Solimani may construct a lap pool at, and parallel to, the property line of the Solimani Property adjacent to Sierra Mar Drive. The pool shall be not wider than 9 feet, not longer than 25 feet and no deeper than 4 feet and shall be engineered and built to meet or exceed by 150% the City of Los Angeles requirements for construction of a swimming pool on a hillside.

2. Solimani agrees to transfer to Pashaie for no additional consideration fee title to the portion of the Solimani Property covered by the existing recorded easement in Pashaie's favor. Solimani and Pashaie shall sign all documents necessary to legally effect the transfer of the property subject to the easement in compliance with all governmental requirements; but in no event shall Solimani be required to transfer more than 5,000 square feet if the minimum lot size for the Solimani Property is 15,000 square feet. If the minimum lot size for the Solimani Property is less than 15,000 square feet, Solimani shall transfer the entire easement area to Pashaie.

3. Pashaie shall grant Solimani an easement over 2 strips of land, each one foot wide, one at the northerly end of the Pashaie Property and one at the southerly end of the Pashaie Property for the drainage of water from the slope on the Solimani Property to Hillcrest Drive. Solimani shall construct and maintain, at Solimani's sole cost, drainage facilities designed by a qualified engineer and approved by Pashaie in writing. The drainage facilities shall be built in compliance with all applicable laws and with all necessary permits. The drainage facilities shall be underground and Solimani shall replace any landscaping on the Pashaie Property which is damaged by the installation of the drainage facility. Solimani shall indemnify and hold Pashaie harmless from any damage arising from the construction, operation or failure of the drainage facilities to safely divert the water from the slope.

4. The covenants contained in this agreement shall run with the land and shall be binding upon the parties to this agreement, and their successors and assigns during their respective periods

of ownership.

5. If suit is brought to enforce this agreement the losing party shall pay the prevailing party's reasonable attorney's fees.

PASHAIE                                    SOLIMANI

_____           _____
MICHAEL PASHAIE                            PARVIZ SOLIMANI

_____           _____
SHAHLA PASHAIE                             PARICHEHER SOLIMANI

Solemani Property EXHIBIT "A"

Description:

THOSE PORTIONS OF LOTS 33, 34 AND 35 OF TRACT NO. 6415, IN THE
CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA,
AS PER MAP RECORDED IN BOOK 81, PAGES 80 AND 81 OF MAPS, IN THE
OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS
FOLLOWS:

COMMENCING AT A POINT IN THE EASTERLY CURVED LINE OF HILLCREST
ROAD, 60 FEET WIDE AS SHOWN ON THE MAP OF TRACT NO. 21360,
RECORDED IN BOOK 587 PAGES 59 TO 63 INCLUSIVE OF MAPS, IN SAID
COUNTY RECORDER'S OFFICE, SAID POINT BEING DISTANT NORTHERLY
THEREON 131.63 FEET FROM THE NORTHWEST CORNER OF LOT 79 OF SAID
TRACT 21360; THENCE EASTERLY ALONG A LINE BEARING SOUTH 79
DEGREES 50 MINUTES 00 SECONDS EAST TO ITS INTERSECTION WITH THE
WESTERLY LINE OF LOT 33 OF TRACT NO. 6415, SAID POINT OF
INTERSECTION BEING THE TRUE POINT OF BEGINNING; THENCE CONTINUING
SOUTH 79 DEGREES 50 MINUTES 00 SECONDS EAST TO A POINT IN THE
CURVED EASTERLY LINE OF SAID LOT 33, SAID POINT BEING DISTANT
NORTHERLY THEREON 43.18 FEET FROM THE SOUTHEAST CORNER OF SAID
LOT 33; THENCE SOUTHWESTERLY FOLLOWING THE SOUTHEASTERLY LINE OF
SAID LOTS 33, 34, AND 35 TO ITS POINT OF INTERSECTION WITH THE
SOUTHEASTERLY PROLONGATION OF THE NORTERLY LINE OF LOT 79 OF
SAID TRACT 21360; THENCE ALONG SAID PROLONGATION NORTH 79 DEGREES
50 MINUTES 00 SECONDS WEST 105.10 FEET TO A POINT IN THE WESTERLY
LINE OF SAID LOT 35.  SAID POINT ALSO BEING THE NORTHEAST CORNER
OF SAID LOT 79; THENCE NORTEERLY ALONG THE WESTERLY LINE OF SAID
LOTS 35, 34 AND 33 TO THE TRUE POINT OF BEGINNING.

Pashaie Property EXHIBIT "B"

THAT PORTION OF LOT A OF THE DOHENY RANCH TRACT IN THE CITY OF BEVERLY
HILLS, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP
RECORDED IN BOOK 24 PAGE 91 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER
OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE EASTERLY CURVED LINE OF HILLCREST ROAD, 60
FEET WIDE, AS SHOWN ON THE MAP OF TRACT NO. 21360 RECORDED IN BOOK 587
PAGES 59 TO 63 OF MAPS, IN SAID COUNTY RECORDER'S OFFICE, SAID POINT
BEING DISTANT NORTHERLY THEREON 131.63 FEET FROM THE NORTHWEST CORNER OF
LOT 79 OF SAID TRACT NO. 21360; THENCE EASTERLY ALONG A LINE BEARING
SOUTH 79 DEGREES 50 MINUTES 00 SECONDS TO ITS INTERSECTION WITH THE
EASTERLY LINE OF SAID LOT A; THENCE SOUTHERLY ALONG SAID EASTERLY LINE TO
THE SOUTHEAST CORNER OF SAID LOT 79; THENCE ALONG THE NORTHERLY LINE OF
SAID LOT 79 SOUTH 79 DEGREES 50 MINUTES 00 SECONDS 114.34 FEET TO THE
NORTHWEST CORNER OF SAID LOT 79; THENCE NORTHERLY ALONG THE EASTERLY
CURVED LINE OF SAID HILLCREST ROAD 131.63 FEET TO THE POINT OF BEGINNING.

EXHIBIT "C"



9450 SIERRA MAR DRIVE
LOS ANGELES

STATE OF CALIFORNIA      )  ss.
COUNTY OF LOS ANGELES    )

On _10·6·_____, 1992 before me, _ANNA MARIA ORNELAS_
personally appeared MICHAEL PASHAIE, personally known to me (or
proved to me on the basis of satisfactory evidence) to be the
person whose name is subscribed to the within instrument and
Acknowledged to me that he executed the same in his authorized
capacity, and that by his signature on the instrument the person,
or the entity upon behalf of which the person acted, executed the
instrument.

WITNESS my hand and official seal.

Signature _____

STATE OF CALIFORNIA      )  ss.
COUNTY OF LOS ANGELES    )

On _10·6_____, 1992 before me, _ANNA MARIA ORNELAS_
personally appeared SHAHLA PASHAIE, personally known to me (or
proved to me on the basis of satisfactory evidence) to be the
person whose name is subscribed to the within instrument and
acknowledged to me that she executed the same in her authorized
capacity, and that by her signature on the instrument the person,
or the entity upon behalf of which the person acted, executed the
instrument.

WITNESS my hand and official seal.

Signature _____

STATE OF CALIFORNIA      )  ss.
COUNTY OF LOS ANGELES    )

On _10·6_____, 1992 before me, _ANNA MARIA ORNELAS_
personally appeared PARVIZ SOLIMANI, personally known to me (or
proved to me on the basis of satisfactory evidence) to be the
person whose name is subscribed to the within instrument and
acknowledged to me that he executed the same in his authorized
capacity, and that by his signature on the instrument the person,
or the entity upon behalf of which the person acted, executed the
instrument.

WITNESS my hand and official seal.

Signature _____

STATE OF CALIFORNIA      )  ss.
COUNTY OF LOS ANGELES    )

On _10·6_____, 1992 before me, _ANNA MARIA ORNELAS_
personally appeared PARTCHEHER SOLIMANI, personally known to me (or
proved to me on the basis of satisfactory evidence) to be the
person whose name is subscribed to the within instrument and
acknowledged to me that she executed the same in her authorized
capacity, and that by her signature on the instrument the person,
or the entity upon behalf of which the person acted, executed the
instrument.

WITNESS my hand and official seal.

Signature _____

# EXHIBIT 2

CHARLES J. RAUSCH, JR.
INTERIM CHIEF ZONING ADMINISTRATOR

ASSOCIATE ZONING ADMINISTRATORS
JACK CHIANG
HENRY CHU
LOURDES GREEN
THEODORE L. IRVING
ALETA D. JAMES
FRANKLIN N. QUON
FERNANDO TOVAR
DAVID S. WEINTRAUB
MAYA E. ZAITZEVSKY

# CITY OF LOS ANGELES
CALIFORNIA



ERIC GARCETTI
MAYOR

DEPARTMENT OF
CITY PLANNING

VINCENT P. BERTONI, AICP
DIRECTOR
(213) 978-1271

KEVIN J. KELLER, AICP
EXECUTIVE OFFICER
(213) 978-1272

LISA M. WEBBER, AICP
DEPUTY DIRECTOR
(213) 978-1274

http://planning.lacity.org

November 21, 2017

Harry Touil (A/O)
H77LA LLC
1717 N. Bayshore Drive, Suite 215
Miami, FL 33132

John J. Parker (R)
Pacific Crest Consultants
2197 Stacy Lane
Camarillo, CA 93012

CASE NO. ZA-2015-4070-ZV-ZAD-ZAA
ZONE VARIANCE, ZONING
   ADMINISTRATOR'S DETERMINATION,
   ZONING ADMINISTRATOR'S
   ADJUSTMENT
9448,9450,9458,9460 W. Sierra Mar Drive
Hollywood Community Plan
Zone   : RE11-1
D. M.   : 147B165
C. D.   : 4 – David Ryu
CEQA  : ENV-2015-990-CE
Legal Description: Lots 33 Arb 1, 34, 35 Arb
   1; Tract 6415

Pursuant to Section 12.24 X.28 of the Municipal Code, I hereby <u>DISMISS</u>:

   a Zoning Administrator's Determination to allow a four-foot southerly side yard
   setback in lieu of the 11-foot side yard setback otherwise required by Section 12.21
   C.10(a) of the Municipal Code, in conjunction with the addition of a pool to an
   existing single-family dwelling, inasmuch as the project has been redesigned so
   that the pool does not encroach into the side yard setback and the request has
   been withdrawn,

Pursuant to Los Angeles City Charter Section 562 and Los Angeles Municipal Code
Section 12.27, I hereby <u>DENY</u>:

   a variance from Section 12.21 C.10(d) of the Municipal Code to permit a single-
   family dwelling with an existing nonconforming envelope height of 47.16 feet to
   observe a maximum envelope height of 53 feet, including roof deck guardrails, in
   lieu of the otherwise permitted maximum envelope height of 30 feet, and an overall
   building height of 59.5 feet, in conjunction with the addition of residential floor area
   to a single-family dwelling, which includes a second floor expansion atop the
   existing garage, new covered decks, open viewing and recreational rooftop decks
   and reconfiguration of the dwelling's exterior circular design,

CASE NO. ZA-2015-4070-ZV-ZAD-ZAA                                    PAGE 2

Pursuant to Section 12.24 X.28 of the Municipal Code, I hereby <u>DENY:</u>

      a Zoning Administrator's Determination to allow a further encroachment into the existing nonconforming six-foot northerly side yard setback in lieu of the 11-foot side yard setback otherwise required by Section 12.21 C.10(a) of the Municipal Code, in conjunction with the addition of a second floor atop a garage and a new exterior stairway to access a rooftop deck of a single-family dwelling, and

Pursuant to Section 12.28 of the Municipal Code, I hereby <u>DENY:</u>

      a Zoning Administrator's Adjustment to allow a maximum building height of 28.5 feet, in lieu of the maximum building height of 24 feet otherwise permitted by Section 12.21 C.10(d)(5) of the Municipal Code, within 20 feet of the front lot line for a lot fronting onto a Substandard Hillside Limited Street, in conjunction with proposed improvements to a single-family dwelling.

FINDINGS OF FACT

After thorough consideration of the statements contained in the application, the plans submitted therewith, and the statements made at the public hearing on July 25, 2017, all of which are by reference made a part hereof, as well as knowledge of the property and surrounding district, I find that the requirements for granting a Zone Variance, a Zoning Administrator's Determination and a Zoning Administrator's Adjustment, as enumerated in Section 562 of the City Charter and Sections 12.27 B, 12.24 X.28, and 12.28, respectively, of the Los Angeles Municipal Code have been established by the following facts:

## BACKGROUND

The project site consists of three (3) steep, irregularly-shaped, contiguous lots totaling approximately 19,799 square feet in size. The property has a street frontage of approximately 147.48 feet along the westerly side of West Sierra Mar Drive, and varying lot depths of approximately 194.44 feet along the northerly property line and 103.83 feet along the southerly property line. The site is zoned RE11-1 and designated for Very Low II Residential land uses.

The site is currently developed with a two-story 4,353-square-foot single-family residence that was constructed in 1993. The existing building has a five-foot front yard setback and a legally nonconforming six-foot northerly side yard and a 31-foot southerly side yard. The existing building has a legally nonconforming envelope height of 47.16 feet, as measured from natural grade to the highest elevation of the guardrails, and an overall height of 53.16 feet, as measured from the lowest elevation within five feet of the building to the highest elevation of the guardrails. The applicant proposes a 1,170-square-foot (Residential Floor Area) addition to the existing house, and the construction of a pool in the southerly side yard. The proposed addition will increase the envelope height from 47.16 feet to 53 feet, and the overall height from 53.16 feet to 59.5 feet, including rooftop guardrails.

The discretionary case was filed on November 5, 2015, prior to the effective date of the amended Baseline Hillside Ordinance (BHO) No. 184,802 on March 17, 2017, and therefore is subject to the regulations of the previous BHO.

Neighboring properties to the north, south and east are zoned RE11-1 and designated for Very Low II Residential land uses by the Hollywood Community Plan. The properties are either vacant or developed with single-family residences.

The subject site borders the City of Beverly Hills along the westerly property line. Adjoining properties to the west are located in the City of Beverly Hills and are improved with single-family residences.

Sierra Mar Drive, adjoining the subject property to the east, is a Substandard Hillside Limited Street, with a designated right-of-way width of 26 feet and a roadway width of 20 feet.

Previous zoning related actions on the site include:

> Building Permit No. 1989LA39164 – On August 7, 1989, the Department of Building and Safety (LADBS) issued a building permit for the construction of the existing single-family dwelling with an attached garage.

Previous zoning related actions in the surrounding area include:

> ZA-2014-0149-ZAA – On October 7, 2014, the Zoning Administrator approved a Zoning Administrator's Adjustment from Section 12.21 C.10(a) to allow the construction of a carport with a three-inch side yard setback in lieu of the seven feet required for a single-family dwelling in the RE11-1 Zone, located at 9368 West Sierra Mar Drive.

> ZA-2013-3252-ZV-ZAA-ZAD – On September 26, 2014, the Zoning Administrator approved a Zone Variance to permit a nonconforming height of approximately 41 feet, 9 inches and additions thereto to observe a maximum overall height of 40 feet, 8 inches in lieu of the maximum permitted height of 30 feet as required by Section 12.21 C.10(d)(2), and 4,325 square feet of Residential Floor Area (RFA) in lieu of 3,622 square feet of RFA as otherwise permitted by Section 12.21 C.10(b); a Zoning Administrator's Adjustment to permit reduced separation between the existing single-family dwelling and the proposed accessory building (private gymnasium) of zero feet in lieu of the minimum five feet otherwise required by Section 12.21 C.5(d), and approximately 41 feet from the front property line in lieu of 55 feet as required by Section 12.21 C.5(b); and a Zoning Administrator's Determination to allow a side yard of four feet, eight inches in lieu of 10 feet as required by Section 12.21 C 10(a), and two covered parking spaces in an existing garage in lieu of four spaces (two covered, two additional) as required by Section 12.21 C.10(g)(2), located at 9422 West Sierra Mar Drive.

ZA-2009-0238-ZV-ZAD-ZAA – On March 16, 2010, the Zoning Administrator approved a Variance from the provisions of Section 12.07.01 A.l to permit three kitchens in lieu of four kitchens as originally requested, on a single lot, after a pending lot line adjustment and demolitions/remodels, on the properties presently identified as 1150, 1200, 1210 and the northerly portion of 1120 La Collina Drive; a Zoning Administrator's Determination to permit additions to the existing single-family dwelling at 1200 La Collina Drive, on a substandard hillside street with a frontage improved to less than 20 feet in width as required by Section 12.21 A.17(e)(2); and with a vehicular access route on a street with less than 20 feet of continuous paved roadway as required by Section 12.21 A.17(e)(3); a Zoning Administrator's Determination from the provisions of Section 12.21 C.8 to permit the construction, use and maintenance of nine retaining walls varying in height from 2.5 feet to 15 feet in lieu of the two permitted 10-foot high retaining walls; and a Zoning Administrator's Adjustment from Section 12.21 A.17(b)(2) to permit the use and maintenance of an existing accessory building (pool house) at 1200 La Collina Drive observing a five-foot, seven-inch southerly side yard in lieu of the required eight feet, and the use and maintenance of two existing retaining walls, one varying in height from four feet, six inches to 10 feet in lieu of the permitted six feet in height, within nine feet, two inches of the rear property line, and the other wall varying in height from two feet, six inches to 15 feet in height in lieu of the permitted six feet in height within 14 feet, six inches of the of the rear property line, on two lots totaling approximately 130,200 square feet in the RE11-1 Zone, located at 1120 North La Collina Drive.

ZA-2006-5644-ZAD – On November 8, 2006, the Zoning Administrator approved a Zoning Administrator's Determination to permit the continued use and maintenance of a seven-foot, three-inch wood fence and gates within the front yard setback area of a single-family dwelling in the RE11-1 Zone, located at 9342 West Sierra Mar Drive.

ZA-2006-2705-ZV-ZAA-ZAD – On September 20, 2006, the Zoning Administrator approved a variance from Section 12.21 A.17(f)(l) of the Municipal Code to permit a 55% maximum lot coverage as otherwise required by Section 12.21 A.17(f) of the Municipal Code; an adjustment to permit a reduced rear yard of 22 feet in lieu of 25 feet as otherwise required by Section 12.07.01 C.3 of the Municipal Code; a Zoning Administrator's Determination to permit an eight-foot in height hedge within the front yard in lieu of the maximum three feet, six inches otherwise permitted under Section12.21 C.1(g) of the Municipal Code; a Zoning Administrator's Determination to permit a reduced front yard of zero feet in lieu of five feet as otherwise required by Section 12.21 A.17(a)(l), reduced side yards of four feet in lieu of five feet as otherwise required by Section 12.21 A.17(b)(2) of the Municipal Code, and parking within a two-car garage in lieu of the required five parking spaces as otherwise required as a result of the addition to a single-family dwelling in a Hillside area pursuant to Sections 12.21 A.17(h)(1) and (2) of the Municipal Code, all in conjunction with the remodeling and addition to an existing single-family dwelling in the RE11-1 Zone, located at 9400 West Flicker Way.

ZA-2003-1449-ZAD – On April 9, 2003, the Zoning Administrator approved a Zoning Administrator's determination to permit two parking spaces in lieu of three parking spaces otherwise required as a result of an addition of a recreation room to a single-family dwelling in a Hillside area pursuant to Section 12.21 A.17 of the Municipal Code; and an adjustment from Sections 12.21.01 C.5(k) of the Municipal Code to permit a front yard of 13 feet in lieu of the required front yard of 25 feet required for a proposed accessory building (recreation room) located on a through lot, located at 9443 Sierra Mar Place.

ZA-2001-1031-ZAA – On July 17, 2001, the Zoning Administrator approved a Zoning Administrators Adjustment from Section 12.21 A.17(c) of the Los Angeles Municipal Code, authorizing a height of 42 feet in lieu of the permitted height of 36 feet; and an Adjustment from Section 12.07.01 C.2(c) of the Code authorizing a side yard of five feet in lieu of the required eight feet; in conjunction with the proposed three-story addition to an existing single-family dwelling in the RE11-1 Zone, located at 1363 North Bobolink Place.

## PUBLIC HEARING

A public hearing on this matter was conducted in City Hall on July 25, 2017. In attendance and testifying were the applicant, representatives of the applicant, two (2) abutting property owners and their representatives, and a representative of the Office of the Fourth Council District.

The following is a summary of the points made in verbal testimony:

IN SUPPORT

Applicant's Land Use Representative – John Parker

- The Neighborhood Council met on July 12, 2017 and voted unanimously to "take no exception." Full Board will meet on July 26, 2017.
- Bureau of Engineering (BOE) Referral Form was submitted indicating that the adjacent street is 20 feet wide.
- Have reviewed map submitted by a member of the Neighborhood Council with varying widths identified for streets south of the site via Sierra Mar to the boundary of the Hillside Area as measured by individuals on the Neighborhood Council.
- Easy to have a margin of error in field that is acceptable. The project is relying on BOE's determination. Do not know if BOE is doing any additional review on this matter.
- The subject dwelling was built in 1993 prior to any hillside ordinances.
- Part of the property that is closer to the street has a 35-percent slope and the rest of the property has a 54-percent average slope.
- There is no change in the elevation from the street view. Will add on top of the garage to "square off the building."
- No haul route required. Will export a maximum of 200 cubic yards.
- The northerly side yard is six feet now with a stairway that observes a side yard of nine feet. The ground stairs don't count as an encroachment.

- The nearest home behind the property fronts onto Hillcrest and is located 130 feet away. Said property is tied to lots that abut property to the north, which are vacant.
- Along the south side, a proposed pool will encroach four feet into the required side yard. The water surface will be at the level of the first floor and attached to the foundation.
- A deck currently exists at the ground level.
- The pool could observe the required setback by not constructing a new deck. The existing deck would have to be removed.
- A fifth parking space that is proposed near the pool could preclude movement of the pool.
- Having a pool closest to the front yard is a more feasible option.
- Moving the pool away would create more structure and more height.
- Could drop the pool below the level of the house.
- If the lower deck is removed, the project could not fit a fifth parking space. The pool support pile would be visible but heavy brush exists. (Comment made by applicant's legal representative Elisa Paster)
- There are similar cases approved for yard encroachments.
- With respect to height, the applicant is requesting a variance for 60 feet in lieu of 30 feet and an Adjustment for 28 feet within 20 feet of front lot line.
- The existing dwelling is 57.8 feet tall with guardrails.
- The use of piles to support the pool accounts for the change in height.
- There is one foot difference in elevation of the building. The north end is 11 inches higher which accounts for the one foot. The rest are piles which lower the elevation point to measure height.
- In response to a question from the Zoning Administrator regarding the ability to reduce the deck width and not need a ZAA for the side yard encroachment of the pool and how piles are affected, the applicant's architect (Perkings Mak) responded that the deck cannot shift over or the parking space would be lost. The architect also responded that the proposed deck width would be 19 feet and was asked how that could not accommodate a parking space.
- Mr. Parker clarified that the deck could be reduced and have no need for the ZAA and still keep the required fifth parking space.
- He added that balconies would be reduced on the second level from 13 feet to 10 feet and that piles remain the same for grade and height measurement points.
- The existing building height will not change.
- Per the Baseline Hillside Ordinance (BHO), there is no addition that can be made within 20 feet of the front lot line without the need for a ZAA.
- To keep the same height, more grading is needed which could result in the export of 2,200 cubic yards.
- To carry out the project by-right would still need a discretionary request for grading.
- The building elevation is 25 feet at the north end and 28 feet at the south end.
- There are hedges on the property across the street at Sierra Mar so there would be no visual impacts.
- Have referenced seven cases approved for height increases.
- In response to a question from the Zoning Administrator regarding the reconciliation of square footage numbers on the table on sheet A0.000, the representative indicated that he would need to confirm all the numbers.

## IN OPPOSITION

Legal Representative for Abutting Property Owner (1028 Hillcrest Road, Beverly Hills) – Seena Samina

- Representing the owner below and west of the property.
- Concerns with potential danger of the pool.
- Opposes the claim of "squaring off the building" claiming that he home has a dysfunctional design.
- If squaring off, there is no need for any discretionary actions.
- Not clear on argument regarding the 11-inch difference and why 28 feet of height does not change.
- There are no findings that can be made for the height variance. Findings require that a hardship will occur. There is no hardship. A pool is not a hardship.
- Look at the non-conforming (NC) provisions of the Code. The request should be considered in the spirit of the NC provisions which set out when a project may be retained.
- Agree that there is no discretionary entitlement required from the NC provisions as otherwise had been claimed by Mr. Samina's letter received on the day of the hearing.
- With respect to Finding No. 2, all properties have the same topography, slope and size. The argument is contradictory if claim is for parity with other cases.
- Request fails more under Finding No. 3. The current height is 27 feet more than what is currently permitted and now he applicant wants 61 feet. Samples of seven ZA cases are deceptive as the delta represented in those cases does not reach to the extent of the subject request. No sample case comes close to doubling the permitted height.
- An average delta was 11.3 feet. This is a bad situation which is being made worse.
- The applicant already has a right which is being enjoyed that no one else has.
- Under Finding No. 4, the representative contends that the building is an eyesore due to the existing height. A pool along the southerly property line will be on stilts and directly above the bedroom window of his client's dwelling at bottom of slope. This causes concerns regarding seismic, leaking, maintenance, and noise issues. Will provide a footprint of the client's dwelling.
- The client's dwelling existed when the subject property was built, and there were construction concerns and debris impacts which led to both parties signing an easement agreement.
- Don't know if the grading projection of 200 cubic yards is correct.
- With respect to Finding No. 5 regarding the General Plan, the nonconforming provisions represent the spirit of the Code which should guide the request.
- A variance is not to be used to grant a special privilege.
- The request is self-imposed.
- The ZAA request for a height increase within 20 feet of the front lot line is confusing as it was stated that it is for a height of 28 feet while today's testimony states that the request is for more.
- Findings for the setback reduction are a disservice to neighbors and vacant lots to the north and south which may be developed.
- There is no public necessity.

CASE NO. ZA-2015-4070-ZV-ZAD-ZAA                                                    PAGE 8

- Reserve right to address CEQA.
- The existing covenant is restrictive regarding what can be done on slope and the FAR.                                                                                        ratio.

Second Legal Representative for Abutting Property Owner (1028 Hillcrest Road, Beverly Hills) – Tim Sullivan

- Have submitted a letter for the record.
- There is a restrictive covenant and know that it is not a ZA issue.
- Have had a hearing notice problem. The hearing notice is sent to wrong address. At mercy of neighbors to know when hearing is. (**ZA NOTE**: The official owners' mailing list generated by BTC, the City's designated mail service company, indicates that Ownership 26 in the radius map is owned by Pashaie Michael (TE) & Shahla with a mailing address of N.1028 Hillcrest Road, which corresponds to the representative's clients given address. BTC generates the mailing list addresses from the County Assessor's records, which show this mailing address as the correct and only one.)
- Looking at sheet A3.0 of plans, it shows that both support piles for the pool are visible.
- If the representatives are confused about this, how would the neighbors know?
- Numbers regarding the project do not add up.
- It would be helpful if the record is held open.
- Project is as "... big as the Great Wall of China."
- The pool cantilevers out.
- Even with trees as buffer, they help but do not grow to a height of 60 feet.
- Have not shown a hardship regarding the pool.
- For 25 years, there has been no pool.
- How can a variance for a height increase meet the findings?
- There are no special circumstances or hardships.
- Not sure if CEQA is valid if the project affects hillside even if project is an addition.
- There are too many challenges.

Abutting Property Owner (1028 Hillcrest Road) – Michael Pashaie

- Submits for record an aerial photograph and footprints of subject property and of his home.
- Refers to Sheet A0.00 of plans (Stamped as received by the City on February 2, 2017) and to renderings of what they as neighbors would see.
- Refers to Sheet A3.02 noting that the space is referred to as crawl space but has 12-foot tall ceilings. It will be called inhabitable but can be converted.
- Refers to Sheet A3.03 pointing out that two decks are proposed and refers to the visibility of stilts for the pool.
- References the easement agreement, noting that he is aware that it is not part of the ZA case, but adding that it was agreed in a covenant that a pool would be placed parallel to Sierra Mar.
- Two hundred cubic yards was referred to as 200 cubic feet in a document to neighbors.

CASE NO. ZA-2015-4070-ZV-ZAD-ZAA                                    PAGE 9

- One side yard is being reduced from 11 feet to 6 feet and a roof deck is being added with glass railing.
- The size is 5,700 square feet, but they are calling it at 4,900 square feet, not counting the basement.
- Will take two years to build. How will construction trucks come up and where will they park?
- The applicant is an international gambler.
- Will have noisy parties.
- Have met with the applicant and told him about the easement agreement.
- He refuses to meet anymore.

Abutting Property Owner (1151 Hillcrest Road) - Said Shooshani

- Own lots north of the property which are vacant, but his house is below and partially on the lot.
- The side yard is a concern.
- The envelope of the building will increase.
- The original design of rounded corners was to make the structure more palatable.
- The house was always controversial.
- They can add 500 square feet.
- Share concerns regarding the pool.
- Construction on Sierra Mar has used his property to stage equipment.
- Congestion impacts concern.
- Questions the volume of the basement.
- A section sheet in the plans shows a grey area which is not clear what it is for.
- Plans look like more envelope even if not habitable.
- The dwelling is a big eyesore.

GENERAL

Office of the Fourth Council District Representative – Vicky Tabitian

- Requests that record be kept open.
- Have not met with the applicant. There has been no effort to reach out to the Council Office.
- Unclear as to encroachments on roadways and any discrepancies.
- No confirmation from BOE regarding discrepancies.
- No findings made regarding addition of roof deck.

REBUTTAL

Applicant's Representative – John Parker

- If no roof deck, the project will still have a same request for the change of 11 inches.
- The ownership list shows the abutting neighbor as Ownership No. 26 and shows the correct address.

- Reiterates that Section 12.23 of the Code regarding nonconforming would not allow even the squaring off of the corners of the building. It still requires a variance which is a fundamental hardship.

Applicant's Legal Representative – Elisa Paster

- There is a fundamental misunderstanding of the project.
- Opponents don't understand the Code.
- This is not comparable to the Great Wall of China.
- It is not a huge addition.
- Not responsible for actions of the prior owner.
- Issues with the neighbor dispute is over a covenant, and he has demanded remuneration.

At the end of the public hearing, the record on the matter was maintained open with two deadlines identified – the first deadline (August 24, 2017) to allow all parties to review any clarifications and revisions made to plans by the applicant and the second deadline (September 12, 2017) to allow parties to submit comments based on a review of any new plans or information submitted by the applicant.

## WRITTEN COMMUNICATION RECEIVED SUBSEQUENT TO PUBLIC HEARING

The following is a summary of specific correspondence submitted on behalf of the applicant, homeowners and Council Office.

### August 18, 2017 - Office of the Fourth Council District

E-mail stating that the Council Office does not believe that the proper findings had been made by the applicant regarding the request for height and setbacks. Notes that the height increase appears to be triggered by a rooftop deck and the setback request by an addition of a "podium type overhung pool." Adds that if mitigation measures can be added regarding the property's downslope and retain the building height as is, then the request for a reduced setback in conjunction with a pool addition is something that the Council Office would entertain. The Council Office states that the applicant has "... plenty of open/patio space without the rooftop deck."

### August 24, 2017 – John Parker with Pacific Crest Consultants – Applicant's Land Use Representative

A packet consisting of the following four items: 1) Letter to the ZA answering questions raised at the hearing and summarizing changes to the plans; 2) Revised ZA findings; 3) Proposed CEQA findings; and 4) Updated architectural plans.

1) Letter to the ZA includes following actions and clarifications:

Withdrawal of the ZAD request to allow the proposed pool to encroach into the southerly side yard. Project design modified to observe the required 11-foot side yard setback, and support piles for the pool removed in favor of a cantilevered

design. Southerly decks are existing and have nonconforming height of 16.6 feet above natural grade. New decks proposed next to the pool will not encroach into the required side yard setback and will be 1.9 feet higher in elevation than the existing deck.

Clarification of the Residential Floor Area (RFA) for each floor for both existing and new as well as the covered patio area. Total existing RFA is 4,353 square feet, and total proposed RFA is 5,523 square feet.

Height of the building above the attached garage has been lowered by one-foot. Building height numbers have been corrected. The maximum height of the existing building is 53.16 feet, while the maximum height of the building with the additions is 59.5 feet, both of which are measured from the lowest elevation within five feet of the building to the top of guardrails. Notes that the 6.34-foot height difference between the existing building and the building with the proposed additions is due to the different points from where the building height is measured. Due the project "squaring off" the existing building and the additions, the lowest elevation within five feet of the building with the additions is lower than the lowest elevation within five feet of the existing building. Clarifies that the actual height difference to the highest point of the elevation is 2.44 feet. References the plans and points of grade elevation used for height measurement and summarizes that the elevation above the new bedroom proposed is 771.6 feet including guardrails while the existing building with guardrails is 769.16 feet with a difference of 2.44 feet.

- Projections into the northerly side yard will consist of 57.3 square feet of building area.

References to "crawl space" have been removed from plans. Such areas that were referenced as "crawl space" in the original plans are actually unenclosed, open areas on a down-sloping earth, which are unimproved and uninhabitable. They have no access or storage viability.

- Responds to points raised in the letter dated July 25, 2017 written by Jeffers, Mangers Butler & Mitchel (JMBM) regarding findings to be made. Asserts that the claim that squaring off the existing building can be done as a by-right project is inaccurate as nonconforming provisions regarding building height would require compliance with all current codes requiring a discretionary action or reducing the building to the permitted height, which is impractical and an unnecessary hardship that is even more complicated by severe topography. Contends that a special circumstance is the original design of the building with rounded exterior elements which create inefficient interior space and  not the design preference of the current owner. Clarifies that the request is actually only adding 2.44 feet of height and that similar cases referenced were not hand-picked as claimed but were located within a1,500-foot radius, noting that deviations were granted for height. Corrects the JMBM's letter's claim that setback encroachments cannot be further reduced due to nonconforming provisions. Mr. Parker states that there is no request to deviate from nonconforming provisions as there is no relief spelled out for such and that JMBM misstates the law as to the applicability of those provisions.

2) Copy of revised findings for all requests, including background and project description, totaling 25 pages, a copy of which is attached to file. Submission includes general discussion points originally submitted with the request but with an additional emphasis on some of the specific items and clarifications regarding height and encroachment dimensions noted in the letter to the ZA.

3) Copy of narrative language addressing each exception required for the issuance of a Categorical Exemption, noting that project is a modest addition that would not have a significant impact on the environment.

4) A set of revised architectural plans (Stamped as Received August 25, 2017)

<u>September 11, 2017 – Timothy Sullivan, Attorney for property owners Michael and Shahla Pashale, 1028 Hillcrest Road</u>

- Letter stating that the applicant's August 24, 2017 submittal did not answer questions raised at the public hearing, except for changes associated with the proposed pool. The letter states that there would be large retaining walls that are visible from the property below the project site that would affect sightlines of the mountains.

- Letter notes that the applicant's objective of squaring off the existing building's circular design means that the curved structure must be torn down and rebuilt, which would mean that the house could be torn down partially and be considered a new house that would be subject to "… more stringent ordinances".

- Letter claims that the existing covenant between the applicant and neighbor is not a private matter as stated at the hearing and that the City should honor it and not allow any additions to the existing building that will exceed the existing footprint.

- Letter includes attached letters from two neighbors in opposition to the request, citing height, past use of home as a party house that negatively affects the neighborhood, police action related to the current use of the home as a party house, and construction impacts on streets that were recently repaved with financing by neighbors.

- Letter also cites a report written by the original architect of the applicant's dwelling who was asked to review the applicant's request. The architect notes the following general conclusions in the report as summarized by Mr. Sullivan: 1) new February 27, 2017 ordinances apply to the project, because the project was not submitted to plan check before then (<u><b>ZA Note</b>: The recently adopted hillside ordinance exempts projects where a Planning entitlement was filed prior to the effective date of new ordinance on March 17, 2017, and the subject application was filed on November 5, 2015. Therefore, the subject application is exempt from the new regulations. The correct effective date of the amended Baseline Hillside Ordinance is March 17, 2017.</u>); 2) the project exceeds 50 percent of the value of the existing home and needs to be brought up to code; 3) inconsistencies in plans in the way height is measured and compared; 4) additions to straighten out the existing curvy

elevations of the house is a new construction not covered by the non-conforming height limit; 5) the new RFA must comply with current hillside regulations; 6) the additional parking space is in the front yard setback; 7) the new addition on top of the garage cannot count towards non-conforming height; and 8) the covered balcony on the second floor counts towards the RFA square footage.

- Letter includes correspondence from a licensed engineer giving his opinion that the proposed renovations are so extensive that the project almost becomes a new structure that should be subject to current regulations and would require a new roof structure, strengthening of load bearing walls and significant structural work.

## September 12, 2017 – Jeffer, Mangels, Butler and Mitchell LLP, (JMBM) Attorneys for property owners Michael and Shahla Pashale, 1028 Hillcrest Road

- Letter states that if the applicant is just proposing to "square off" the existing building's curvy design, the project should not require a new pool, six (6) additional feet of envelope height and 2.44 additional feet in the overall building height, 1,200 square feet of new square footage and reduced side yards.

- Letter cites the required variance findings noting that the applicant already has an existing structure that exceeds the height of other buildings in the area. Notes that the applicant is an absentee-owner who rents the home out as an event venue and that the request is not to resolve practical difficulties but rather to create a more attractive event venue with a new pool and decks.

- Letter contends that RFA numbers submitted in most recent plans do not add up and that there is 132 square feet of RFA that are unaccounted for. Recommends that the ZA require he applicant to correct errors.

- Letter claims that the height increase request within 20 feet of the front lot line remains unclear as the maximum height of the proposed building with additions will continue to be 28.5 feet within 20 feet of the front lot line, while the applicant states that the actual height increase for the entire building will be 2.44 feet. Questions why the existing and proposed building height of 28.5 feet within 20 feet of the front line does not change even with a stated difference of 2.44 feet of additional height.

- Letter contends that plans are unclear and that the applicant is using creative language of "squaring off" or "straightening" to "camouflage" a major construction project that may require taking the house down to studs and trigger provisions of the Building Code if the project exceeds 10 percent of the replacement value of the building.

- Letter refutes applicant's argument in the August 24, 2017 letter that even squaring off a single corner would trigger compliance with current code and that nothing could be done to modify the exterior without a variance. JMBM points to language in the Code that only applies if a structure is "…added to or enlarged in any manner" and concludes that the "squaring off" could be done without a variance.

Letter notes that "squaring off" is not the actual project the applicant is proposing; that it is merely used as "... baseless justification..." for the requested entitlements; and that the requests are triggered, because the building will be enlarged and not only squared off.

- Letter states that in revised findings from the applicant, the argument for special circumstances has been modified to refer to the awkward design of the existing building as the justification rather than topography as originally suggested. Letter notes that this argument is ludicrous as it would signify that any homeowner who does not like his/her home design could claim that as a special circumstance in a variance request.

- Letter asserts that the height request does not meet the finding standard for a substantial property right enjoyed by others, as the applicant's home is already taller than others in the area and that he applicant has changed the legal standard to "... other smaller deviations have been granted".

- Letter cites the danger emanating from the redesign of the pool to a cantilevered structure and potential impacts arising from seismic activities; blocked views resulting from an addition to the height and size of the building; potential and past construction impacts which led to a covenant entered into by the former owner of the current applicant's property and JMBM to limit the area of construction activity.

- Letter references a petition and letters from neighbors in opposition to the entitlement requests that are attached to said letter and cite similar concerns. Concerns noted the use of the house as a party house with several calls made by neighbors to the Police Department, parking on narrow streets, a speculation that improvements are proposed in order to make the house a more attractive venue rather than just to "square off" the circular and curvy design.

- Letter objects to the Adjustment request arguing that the height has increased from the original request from one (1) foot to 2.44 feet.

- Letter notes that the applicant states in his findings that northerly and southerly abutting properties are likely to stay vacant but has not contacted those owners for any confirmation. Notes that both property owners have written in opposition.

- Letter states that the ZAA findings cannot be made for the proposed project.

- Letter notes that the project should not use CEQA's Categorical Exemption given the site topography. The project needs to assess environmental impacts related to hazards and hauling activities, and cumulative impacts of a "... successive project of the same type in the same place".

<u>September 14, 2017 – Chris Parker with Pacific Crest Consultants – Applicant's Land Use Representative</u>

- E-mail request to ask if there is an opportunity to respond to opponents' references to errors and mistakes in the applicant's submittal. The ZA granted a limited extension until September 18, 2017 for the applicant to correct or clarify any issues raised.

## September 18, 2017 - John Parker with Pacific Crest Consultants – Applicant's Land Use Representative

- Packet received consisting of the following items: 1) Letter to the ZA in response to letters submitted by attorneys post hearing on behalf of the neighbor of a property adjacent to the applicant's property; 2) updated Sheet A0.0 of the architectural plans to reflect the correct RFA for the second story addition; and 3) a letter from the applicant's attorney, which is summarized separately herein.

- Letter notes that it will only address specific points as other points have been addressed in other letters.

  Letter acknowledges an error regarding the RFA of the second floor addition in Sheet A0.0 and corrects it to 615 square feet of new construction instead of 483 square feet.

- Letter notes that the use of the word "approximate" is a qualifier used in findings and that it is not expected to be used in the Letter of Determination.

- Letter explains that the height measurement within 20 feet of the front lot line remains the same at a maximum of 28.5 feet and that the second floor addition over garage height will be 25.5 feet. The latter height is 2.44 feet taller in maximum elevation, but because the street elevation itself is higher at the northerly end, the maximum building height is lower.

- Letter notes that the project will comply with all applicable zoning and building code regulations.

- Letter states that it would be impossible to redesign the home so that no enlargements or additions would occur in accordance with Section 12.23 A.2 of the Municipal Code noting that the existing floor area would need to be substantially reduced and no second floor, balconies, decks, exterior stairways or pool could be added.

- Letter responds that a quote referenced by JMBM in its letter stating that the applicant is changing the legal requirement of variance finding to "… other smaller deviations have been granted" could not be found in the findings or other submittals from the applicant.

## September 18, 2017 – Elisa Paster, Attorney for Applicant

- Letter states that the argument that there are no special circumstances that apply to the subject property lacks evidence to support claim. Letter adds that

topography, existing structure and new Hillside Ordinance make it impossible to modify a structure without a variance, also citing the nonconforming provisions. Notes that any change, such as adding a cover to a porch, needs a variance.

- Letter notes that the entire second level and most of the first level do not comply with the 30-foot height limit established. The attorney contends that any exterior modification can only occur through a variance and that is the practical difficulty and unnecessary hardship in this case coupled with existing height.

- Letter asserts that the applicant has at no point attempted to change a legal standard for a variance and cites the required finding that references substantial property right or use possessed by others in the same zone and vicinity, and that opponents are wrong to state that other approvals in the area are irrelevant as those approvals are the point of the finding.

- Letter states that the JMBM letter engages in speculation regarding detrimental impacts without any evidence; that it challenges the feasibility of a pool and impact on a home that is 130 feet away; and that the nearest homes are between 95 to 150 feet away and located downslope with heavy vegetation that does not support "... alleged height and size problems."

- Letter also notes that the property owner at the bottom of the slope does not reside on said property but rents it out.

- Letter states that the home across the street "... looms over the Property" and that height is mischaracterized. Photo of neighboring property is included.

- Letter cites JMBM letter as wrongly using past problems associated with construction on the subject property under prior owner as potential issues with the proposed project. It notes that all current rules and regulations will be followed and that excessive haul traffic is unfounded as 360 cubic yards of dirt will be removed and no haul route approval is required.

- Letter states that T. Sullivan letter regarding the pool lacks substance and that in the accompanying letter from ZDX, the author admits he lacks necessary detail to make conclusions. Letter notes that any engineering issues are handled in plan check and that project will comply with all codes.

- Letter challenges JMBM use for CEQA purposes the argument that unusual circumstances exist regarding the slope that do not allow the use of a Categorical Exemption. Letter cites court as instructing that such circumstance relates to a feature of the project that distinguishes it from other features in the exempt class. Letter argues that JMBM has argued that the subject property is in an area with similar size, shape and topography, and therefore JMBM's use of slopes as justification for an unusual circumstance do not meet the standard as set forth by court law.

- Letter notes that narrow roads in the hillside also are not an unusual circumstance as this is common to almost all hillside area and this has resulted in stricter hillside regulations.

- Letter adds that pool configuration is also not an unusual circumstance and that it is outside of the setback as redesigned and permitted by the Code.

- Letter states that there are no facts showing that any cumulative impacts exist with the scope of project being less than original construction.

- Letter summarizes technical corrections regarding numbers as already clarified in the letter from Pacific Crest consultants.

- Letter states that the existing covenant is a private agreement between two parties wherein the City has no obligation or authority to enforce. Adds that covenant arguments have no relevance to proceedings and should be disregarded.

- Letter claims that JMBM's letter regarding the applicant's character and use of the property include no evidence and are irrelevant to the proceeding. Letter notes that these are libelous and responds to them regardless. Letter notes that the applicant has been in Europe for the last two years and that when one renter had a party, the renter was removed immediately. Letter states that the applicant has no knowledge as noted in JMBM's letter of any investigations or contact by the District Attorney. Letter states that "Opponent's attempt to highjack the cloak of public authority in order to suggest any type of wrongdoing by Applicant, is utterly frivolous."

- Letter claims that the community's position attached to JMBM's letter is founded on misinformation and speculation, citing references to a covenant in the petition as well as conclusions regarding slope stability and seismic safety. Letter adds that the project may have been mischaracterized to gain support.

- Letter asserts that contrary to JMBM's letter's claim, the applicant has not waived any of its arguments.

### October 18, 2017 – Letter from Officer Benjamin Thompson, Hollywood Vice, Los Angeles Police Department

- Letter cites the subject property as a location which has received complaints from neighbors that the property is used for short-term rentals and that the renters use the dwelling for parties that result in nuisance impacts. Letter notes that a criminal complaint has been "..formatted.." that will be filed regarding the commercial use and encloses some of the redacted crime reports and arrest and calls for service reports that are the foundation for the complaint. Attachment includes a follow-up investigation report regarding a victim who reported that she had passed out at a party at the house and was told that she had sex with the suspect to which she had not consented and for which she had no recollection of it happening. The address of the occurrence was 9450 Sierra Mar Drive and the date of the

occurrence was July 17, 2016. The report notes that the victim was unsure if she wanted to pursue prosecution noting that the suspect had been recently shot and she "...is concerned about the people the suspect hangs out with..." Investigation status was noted as ongoing. A related report is also enclosed from the Sheriff's Department, County of San Bernardino where the victim reported the incident on August 23, 2016. Other information attached includes an issued Notice to Appear for a misdemeanor for loud music on June 17, 2017, Calls for Service on 8/12/16, 10/21/16, 12/31/16 and 8/2/17. These calls are related to dispute business, prowler suspect and two for which codes are not defined further. Other references included are to occurrences on 3/22/15, 7/18/16 and 6/17/17 for which a specific description of the activity is not provided.

## VARIANCE FINDINGS

In order for a variance to be granted, all five of the legally mandated findings delineated in City Charter Section 562 and LAMC Section 12.27 must be made in the affirmative. Following is a delineation of the findings and the application of the relevant facts of the case to same:

1.   **The strict application of the provisions of the zoning ordinance would not result in practical difficulties or unnecessary hardships inconsistent with the general purposes and intent of the zoning regulations.**

The variance request is to allow a single-family dwelling to exceed the permitted envelope height of 30 feet for a building in the RE11-1 Zone with a roof slope of less than 25 percent, as established by the Municipal Code under the previous Baseline Hillside Ordinance (BHO) No. 181,624, effective 2011. The existing building already has a legal nonconforming envelope height of 47.16 feet and an overall building height of 53.16 feet, as measured to the top of the guardrails. Envelope height is measured as a plumb line or vertical height between the top of a projected plane for a roof or parapet wall and the grade directly below it. The applicant is proposing a 1,170-square-foot addition of residential floor area to the existing building, which will increase the envelope height to 53 feet and overall building height to 59.5 feet, as measured to the top of the guardrails. The dwelling's existing residential floor area is 4,353 square feet.

The BHO allows an applicant to request a Zoning Administrator's Determination (ZAD) pursuant to Section 12.24 X.28 of the Municipal Code to allow structures to exceed the maximum envelope height requirements provided that the overall building height does not exceed 45 feet, as measured from the lowest grade within five feet of the exterior walls of a building or structure. However, since the subject dwelling already exceeds the overall building height of 45 feet, the ZAD is not an option and thus a variance is required, which requires more stringent findings.

The subject dwelling was issued its building permit in the late 1980s prior to the enactment of any comprehensive hillside regulations, the first of which were adopted in 1992. The dwelling is located on a downslope lot with the structure occupying that portion of the lot closest to the street and thus observing a five-foot

front yard setback. Much has been attributed to the circular design of the building as the catalyst for the request for the height variance. The primary justification made on behalf of the applicant is that the circular elements of the design creates an inefficient use of space and that the variance is sought to be able to "square off" those design elements to make the dwelling more functional. The argument relies on a desire to make design changes to an existing building as the compelling justification to establish hardship. This argument would then entitle anyone to use such a design rationale to seek a variance where there are no other issues of disparity or hardship. In this case, in purchasing the property, the applicant would have been aware of the design and whether it was functional or not and would have been expected to take that into consideration in any final decision on buying the property as is. However, the variance request entails more than an alteration to a design element. It also includes a request for the expansion of the second floor through the addition of 615 square feet of floor area consisting of two (2) proposed bedrooms above an existing garage as well as the addition of covered decks. Both elements extend above the permitted 30-foot maximum height envelope and viewing and recreational decks. These additions are represented as almost incidental to the squaring off and not justified on their own in terms of the variance findings, particularly as to how they do not represent a self-imposed hardship.

In this instance, there is no hardship associated with the request that relates directly to the ability to build a dwelling on the property. A variance is a discretionary process that must have an affirmation of all the required findings to be granted when there are issues of disparity and hardship. As noted, a building permit for the construction of the existing residence was issued in 1989 based the adoption of any BHO regulations and with no additional discretionary entitlements necessary. Compliance with the zoning regulations in effect at the time was attainable.

The applicant's representatives have cited the existing nonconforming regulations as a rigid roadblock that prevents any change, even a "… simple change…" from occurring without compliance with the Zoning Code and without seeking a variance. They have indicated that no floor area can be added without a variance. The assertion regarding the required compliance with the Zoning Code is accurate. The requirement for a variance in conjunction with any request for a change or addition is not entirely correct.

Section 12.23 of the Municipal Code reads as follows:

> 2. **Buildings Nonconforming as to Height or Encroachment Plane.** *A building, nonconforming only as to height or encroachment plane regulations, may not be added to or enlarged in any manner, unless the additions or enlargements conform to all the current regulations of the zone and other applicable current land use regulations, provided that the total aggregate floor area included in all the separate additions or enlargements shall not exceed 50 percent of the floor area of the ground floor of the building or structure.*

The above language does allow for an addition of floor area provided it does not exceed 50 percent of the floor area of the ground floor which for the subject dwelling is 2,619 square feet. So theoretically, 1,309 square feet could be added if it complied with current zoning regulations. Thus, in this case, the applicant could add that amount of floor area to the dwelling, provided it did not exceed the maximum envelope height of 30 feet without the need for a variance and the permitted residential floor area. Of course, the result would not be the project as proposed but it would retain some of the elements of the request and not include those physical elements which do not justify an affirmation of any variance findings. The Zoning Administrator consulted further with the Department of Building and Safety's Zoning Engineer, who confirmed the applicability of the nonconforming provisions and reviewed the plans. As noted by the Zoning Engineer, the overall maximum building height is now irrelevant unless the project is exempt from BHO. In this case as noted previously, the overall height also plays a role in not allowing the project request to use the ZAD process to exceed the permitted envelope height as that process is limited to a request that does not exceed an overall height of 45 feet.

Nonetheless, the Zoning Engineer agreed that anything could be added or modified below the maximum envelope height. The project could eliminate the recreational roof deck in order to be able to meet the height limits for some aspects of the proposed project. This would allow for approximately one-half of the proposed second floor addition to be added without any encroachment into the 30-foot envelope height. Therefore, Bedroom 3 (as shown in Sheet A2.02 of the plans) could be retained. The remaining back portion could remain as an uncovered deck and would possibly be able to extend to the edge of the existing garage footprint, given existing nonconforming rights regarding yard setbacks. If, however, it was deemed to encroach into a yard or be impacted by the height envelope, such deck could still extend for a depth of approximately 8 feet without encroaching into either setback or envelope, which remains a generous size.

Along the southerly side yard, the upper/second level proposed deck would need to remain uncovered but the lower deck could be covered for a linear distance of approximately 24 feet, before that cover pierced the permitted envelope height limit. Without the proposed recreational roof deck, there might possibly be the ability to "square off" portions of the front façade, although what such undertaking entails remains unclear in terms of what it signifies structurally. Under such scenario, there might still be a slight increase in the building over the 24-foot height limit established for a building 20 feet back from the front lot line but such would be subject to a Zoning Administrator's Adjustment which requires different findings than those for a variance.

The purpose of the current hillside regulations regarding height is to allow for buildings that are tiered and cascade with the topography of the slope. Prior regulations and those which the existing building observes did not require a tiered or stepped-back design and thus resulted in buildings which allowed for a more massive building envelope than that currently permitted.

The zoning provisions do not impair the property owner from enjoying the use of the property for a single-family use. There is no finding that can be made that the zoning regulations regarding the development of the property impede the ability of the property owner to continue to enjoy a reasonable and viable use of the property as has been the case for over 20 years. Of significance for the grant of a variance is whether the use of the property is reasonably compromised by the zoning provisions. The desire to remodel and add floor area to the existing dwelling in a manner that results in a taller building than the already existing legal nonconforming building represents a self-imposed hardship. As noted, the ability to make modifications to the dwelling which do not trigger a variance remains an option. Charter Section 562 states that a variance shall not be used to grant a special privilege or to permit a use substantially inconsistent with the limitation on other properties in the same zone. The property already enjoys a privilege that others do not necessarily enjoy by virtue of the nonconforming status regarding height.

A variance is an appropriate means to seek relief from a condition that is not self-imposed and to remedy a disparity of privileges. In this case, a grant of the variance request would be akin to the granting of a special privilege which is otherwise not provided to other property owners who abide by the applicable zoning provisions. A grant under these circumstances would be inconsistent with the general purpose and intent of the zoning regulations, particularly as these have evolved for development in hillside areas. The request would reinforce what the hillside regulations do not promote as a development prototype.

2.   **There are no special circumstances applicable to the subject property such as size, shape, topography, location or surroundings that do not apply generally to other property in the same zone and vicinity.**

The project site is steep with an average slope of approximately 54 percent over the entire site. However, given that the subject property is located in a hillside area, other properties in the same zone and vicinity have similar topographic characteristics as the subject property. Additionally, the fact that the property has been developed with a legally nonconforming structure which exceeds some of the current zoning regulations is not a special circumstance attributed to the land itself that can be used to satisfy this finding as such represents a building feature already in excess of what other properties are permitted.

3.   **The variance is not necessary for the preservation and enjoyment of a substantial property right or use generally possessed by other property in the same zone and vicinity but which, because of the special circumstances and practical difficulties or unnecessary hardships, is denied to the property in question.**

As noted, there are no special circumstances or unnecessary hardships, other than those which are self-imposed which justify a grant of the request. The applicant has referenced other variances regarding grants for relief from height in the area. While each case has its own particular characteristics and should be evaluated

individually, all except one of the variances cited are based on regulations that preceded the maximum envelope height regulation established to guide hillside development. The applicant does cite one property which was granted an increase in the envelope height located at 9422 West Sierra Mar Drive. The dwelling had a nonconforming envelope height of approximately 41 feet, 9 inches and was permitted additions which observed a maximum envelope height of 40 feet, 8 inches in lieu of the maximum permitted height of 30 feet. This property was granted a variance, as the proposed additions did not exceed the legally nonconforming building envelope height which was the justification set forth and emphasized by the applicant's representative in that case. As previously mentioned, the existing building already has a legal nonconforming envelope height of 47.16 feet, and the request is to increase that envelope height to 53 feet, unlike the referenced variance which did not exceed the existing nonconforming envelope height. The proposed addition would exceed the legally nonconforming envelope height by approximately six (6) feet.

It was the overdevelopment of properties in hillside areas that resulted in the adoption of further height provisions based on a different concept of envelope height rather than on the prior specific height limits tied to slope percentages. This regulation was based on a stepping back of a building so as to reduce massing effects and to minimize grading work. The grant would also set a precedent for a request for new development or for additions to dwellings beyond the permitted height envelope limits within hillside areas where sensitive and compatible development is promoted through compliance with BHO. There is no substantial property right which is denied the property owner as the property already enjoys additional height nonconforming rights and there remain development options that can be implemented in conformance with the zoning provisions.

4.    **The granting of the variance will be materially detrimental to the public welfare, or injurious to the property or improvements in the same zone or vicinity in which the property is located.**

The hillside provisions regarding maximum height limits were approved after years of open public discussion, hearings and analysis. A grant to deviate from such provisions, when there is no significant constraint on the property to feasibly develop it or where there is a reasonable development on-site, undermines the objectives of said regulations. The granting of the variance would establish a precedent, particularly problematic, if an approval is not based on a legitimate land use and zoning impediment or a valid disparity of privileges, all of which are not evident in this case. Under such circumstances, a grant to allow an addition to an existing single-family dwelling to exceed already nonconforming building heights compromises the integrity of the variance process and the applicability of findings and ultimately is detrimental to public welfare and injurious to other properties and improvements in the immediate vicinity.

5.   **The granting of the variance will adversely affect any element of the General Plan.**

The Hollywood Community Plan designates the property for Very Low II Residential land uses with corresponding zones of RE11 and RE15 and Height District 1. The property is not currently within the area of any specific plans or interim control ordinances.

The use of the property for a single-family dwelling is consistent with the Plan. However, the Community Plan encourages preservation and enhancement of well-defined residential neighborhoods in Hollywood by further refining and tailoring development standards to neighborhood character. The adoption of the height provisions for hillside areas was directed at correcting issues of overbuilding on lots in single-family neighborhoods which ultimately undermined the character of said neighborhoods. Granting a variance to exceed the height limit established by hillside regulations and also to exceed the existing legally nonconforming building height is not in conformance with the Community Plan's objective to preserve the character of a low-density residential neighborhood and prohibit development of over-sized homes in the hillside areas.

**ZONING ADMINISTRATOR'S DETERMINATION FINDINGS – Northerly Side Yard.**

6.   **The project will not enhance the built environment in the surrounding neighborhood or will not perform a function or provide a service that is essential or beneficial to the community, city, or region.**

The request entails a proposed addition of residential floor area to the existing single-family home. The existing building currently has a legal nonconforming six-foot northerly side yard and a 31-foot southerly side yard setback. The proposal includes a request to enclose the existing uncovered roof deck above the garage to create additional bedrooms and bathrooms, which will result in a six-foot northerly side yard setback in lieu of the otherwise required 11-foot setback. The proposed addition will maintain the existing legal nonconforming side yard setback which currently consists of an encroachment of a portion of the garage. The same footprint would remain. However, the encroachment would now consist of an enclosed building mass at the second level rather than an open deck. Furthermore, to allow the subject portion of the enclosed second floor to encroach into the side yard setback, would require a grant of the variance to exceed the maximum envelope height at this point. Such has not been granted as noted in the variance findings. Along with the proposed second floor addition, a new exterior stairway would be created along the northerly façade of the two new bedrooms in order to provide access from the expanded second floor to the reconfigured recreational roof top deck. A limited portion of this new stairway would also encroach into the side yard. Ultimately, the request for the side yard reduction is tied to the variance request for height and as such, a grant which relies on additional height that is not found to merit approval, would equally not be considered to enhance the built environment.

7.   **The project's location, size, height, operations and other significant features will not be compatible with and will adversely affect or further degrade adjacent properties, the surrounding neighborhood, or the public health, welfare, and safety.**

The existing building already observes a legally nonconforming northerly side yard setback of six feet. The dwelling currently has an open deck above the garage along that setback. The request would represent an intensification of an existing encroachment into the side yard when considering that the second level that is currently open to the sky above the garage would now be enclosed without adhering to an 11-foot setback. Although the encroachment would be limited in size to approximately 57 square feet, it remains nonetheless tied to the height variance request, and cannot be divorced from the overall scope of that part of the proposed project and request. As such, the proposed project's overall size, location, height and other features would not further complement or strengthen compatibility with adjacent properties.

8.   **The project does not substantially conform with the purpose, intent and provisions of the General Plan, the applicable community plan, and any applicable specific plan.**

The Hollywood Community Plan designates the property for Very Low II Residential land uses with the corresponding zones of RE11 and RE15. The property is not currently within the area of any specific plans or interim control ordinances.

The proposed project will maintain its existing legally nonconforming northerly side yard of six feet with the second-story addition and new stairway but its encroachment will be intensified rather than alleviated. The Hollywood Community Plan encourages the preservation and enhancement of the varied and distinctive residential character of the community. The proposed use will remain as a single-family dwelling, which is consistent with the land use designation. However as noted in Finding No. 5, since the project encompasses additional discretionary entitlements, the whole of the project must be considered which has been found to not be in conformance with the objectives of the Hollywood Community Plan and the City's direction to comprehensively address hillside development.

9.   **The project is not in conformity with the public necessity, convenience, general welfare and good zoning practice and the action will not be in substantial conformance with the various elements and objectives of the General Plan.**

The project site is located in the Hollywood Community Plan with a land use designation of Very Low II Residential and is zoned RE11-1. The use of the site will remain as a single-family residence, which is consistent with the zone and the land use designation. However, the granting of the Zoning Administrator's Determination request to allow an additional physical encroachment into the already legally nonconforming reduced side yard will not further public necessity,

convenience, general welfare and good zoning practice inasmuch as the action relies on a grant of additional height deviations from the hillside regulations. Such regulations have been adopted by the City with the objective of controlling volume and building envelope and other hillside development concerns, which the request along with the other entitlements sought would not be able to meet.

10.  **The reduction in yards will be materially detrimental to the public welfare or injurious to the adjacent property or improvements.**

The existing building already observes a legally nonconforming northerly side yard setback of six (6) feet. The applicant has indicated that the adjacent properties are not improved with structures but that residential development is located at the bottom of the hill at significant distances from the subject dwelling. Abutting property owners have argued that there should be no assertion made by the applicant that the existing vacant land will remain as such, arguing that the encroachments will further reduce the viability of new development if encroachments expand. While future development is speculative, once again it is the entire project that is the subject of review. An encroachment that was not triggered by a variance for additional height might have a different set of standards against which to be evaluated favorably, but as noted the project remains tied to the entirety of the other entitlements and thus an affirmation that the request by itself would not be materially detrimental or injurious to adjacent property cannot be made.

**ZONING ADMINISTRATOR'S ADJUSTMENT FINDINGS – Height Limitation within 20 Feet of the Front Lot Line**

11.  **Site characteristics or existing improvements do not make strict adherence to the zoning regulations impractical or infeasible, the project does not conform with the intent of those regulations.**

The BHO limits the building height to 24 feet for the portion of the building that is located within 20 feet of the front lot line, if the lot fronts onto a Substandard Hillside Limited Street. The existing building height within 20 feet of the front lot line is 28.5 feet. The applicant asserts that the maximum height will remain unchanged even though it is reduced at the northerly end of the dwelling due to a higher elevation of the street. The height requirements of the BHO are established to have applicants design buildings that follow the terrain of the hills and cascade down or up the slope, rather than having a boxy building sit on a hill. The limits within 20 feet of the front lot line are also targeted at promoting a reduced scale along the street. The inclusion on the rooftop of as described by the applicant "...open viewing and recreational decks..." further contributes to the additional height which exceeds the height limit of 24 feet. Such a rooftop use is an amenity but not a property right, especially when it directly impacts discretionary requests for entitlements specifically tied to height. An elimination of the rooftop deck reduces the scope of the height requested and likely eliminates a variance request for a by right project as described generally in the scenario detailed in Finding No. 1. In this instance, a review of the plans indicates that without a rooftop deck, the portion of

the dwelling that would exceed the 24-foot height limit within the first 20 feet from the front lot line would be significantly reduced but there might still be a limited portion of the building above the 24-foot height limit. Under such a scenario, an adjustment could be considered under more favorable circumstances than those presented under the current request which would not conform with the intent of these specific hillside regulations.

12. **In light of the project as a whole, including any mitigation measures imposed, the project's location, size, height, operations and other significant features will not be compatible with and will adversely affect or further degrade adjacent properties, the surrounding neighborhood, or the public health, welfare, and safety.**

The applicant requests a Zoning Administrator's Adjustment to allow the project as a whole to exceed the allowable height by approximately four feet within 20 feet of the front property line in conjunction with a variance request to allow a dwelling with a maximum envelope height of 53 feet in lieu of the otherwise permitted 30-foot envelope height. The existing building already has a legal nonconforming envelope height of 47.16 feet and an overall height of 53.16 feet, measured to the top of the guardrails. The applicant is proposing a 1,170 square-foot addition to the existing building, which will increase the overall height to 59.5 feet, measured to the top of the guardrails. The proposed addition would exceed the maximum envelope height by 23 feet, the legally nonconforming envelope height by approximately six feet, and the overall height by approximately seven feet. The proposed building height is significantly taller than the maximum allowable building height in the BHO, and will exceed the current legally nonconforming building height. The increase in building height would not be compatible and adversely affect adjacent properties by allowing for a significantly over-in-height building that exceeds the legally nonconforming status of the dwelling as well as the limits of the existing hillside regulations.

13. **The project is not in substantial conformance with the purpose, intent and provisions of the General Plan, the applicable community plan and any applicable specific plan.**

The Hollywood Community Plan designates the property for Very Low II Residential land uses with the corresponding zones of RE11 and RE15. The property is not currently within the area of any specific plans or interim control ordinances.

As noted previously, the Community Plan encourages the preservation and enhancement of well-defined residential neighborhoods in Hollywood by further refining and tailoring development standards to neighborhood character. The proposed request for a single-family dwelling is not an issue as the use is permitted. However, the adoption of the height provisions for hillside areas was directed at correcting issues of overbuilding on lots in single-family neighborhoods which ultimately undermined the character of said neighborhoods. Granting the adjustment in conjunction with the other entitlements, particularly the variance

request, represents a project that will exceed the height limit per the BHO and legally nonconforming building heights and would thus not be in conformance with the Community Plan that aims to preserve the character of a low-density residential neighborhood and prohibit development of over-sized homes in the hillside area.

## ADDITIONAL MANDATORY FINDINGS

14.   The National Flood Insurance Program rate maps, which are a part of the Flood Hazard Management Specific Plan adopted by the City Council by Ordinance No. 172,081, have been reviewed, and it has been determined that this project is located in Zone C, areas of minimal flooding.

15.   On June 14, 2017, the subject project was issued a Notice of Exemption, log reference ENV-2015-990-CE, for a Categorical Exemption, Class 3, Category 1 of the City of Los Angeles CEQA Guidelines, because the project consists of an addition to an existing single-family residence not in conjunction with the building of two or more units. Pursuant to Section 21080(b)(5) of the California Environmental Quality Act, projects which a public agency rejects or disapproves are not subject to environmental review. In denying the project, the Zoning Administrator did not issue a finding regarding the environmental clearance for this project.

## APPEAL PERIOD - EFFECTIVE DATE

The Zoning Administrator's determination in this matter will become effective after December 6, 2017, unless an appeal therefrom is filed with the Department of City Planning. It is strongly advised that appeals be filed early during the appeal period and in person so that imperfections/incompleteness may be corrected before the appeal period expires. Any appeal must be filed on the prescribed forms, accompanied by the required fee, a copy of the Zoning Administrator's action, and received and receipted at a public office of the Department of City Planning on or before the above date or the appeal will not be accepted. **Forms are available on-line at http://planning.lacity.org.**

Public offices are located at:

| Figueroa Plaza | Marvin Braude San Fernando | West Los Angeles |
| 201 North Figueroa Street, | Valley Constituent Service Center | Development Services Center |
| 4th Floor | 6262 Van Nuys Boulevard, Room 251 | 1828 Sawtelle Boulevard, 2nd Floor |
| Los Angeles, CA 90012 | Van Nuys, CA 91401 | Los Angeles, CA 90025 |
| (213) 482-7077 | (818) 374-5050 | (310) 231-2901 |

If you seek judicial review of any decision of the City pursuant to California Code of Civil Procedure Section 1094.5, the petition for writ of mandate pursuant to that section must be filed no later than the 90th day following the date on which the City's decision became final pursuant to California Code of Civil Procedure Section 1094.6. There may be other time limits which also affect your ability to seek judicial review.

CASE NO. ZA-2015-4070-ZV-ZAD-ZAA                    PAGE 28

Inquiries regarding this matter shall be directed to Nuri Cho, Project Planner for the Office of Zoning Administration at (213) 978-1177.


LOURDES GREEN
Associate Zoning Administrator

LG:MN:NC

cc:     Councilmember David Ryu
           Fourth District
        Adjoining Property Owners

# EXHIBIT 3



jmbm.com

Seena Max Samimi
Direct: (310) 785-5344
ssamimi@jmbm.com

1900 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-4308
(310) 203-8080   (310) 203-0567 Fax
www.jmbm.com

August 22, 2022

<u>**VIA E-MAIL**</u>

Maurice D. Pessah
Pessah Law Group
9100 Wilshire Blvd., Ste. 850E,
Beverly Hills, CA 90212
310-772-2261
maurice@pessahgroup.com

Re:   **Cease and Desist All Construction Activities Pursuant to Slope
      Maintenance Agreement dated October 1, 1992**

Dear Mr. Pessah,

          We represent Michael and Shahla Pashaie in connection with the enforcement of
the Agreement Concerning Slope Maintenance dated October 1, 1992 between Michael and
Shahla Pashaie, on the one hand, and Parviz and Paricheher Solimani, your client's predecessor
in title, on the other (the "Slope Maintenance Agreement"). The Slope Maintenance Agreement
restricts development rights on the property located at 9450 Sierra Mar Drive, Los Angeles, CA
90069 ("Touil Property"), in favor of the owner of the property located at 1028 Hillcrest Road,
Beverly Hills, CA 90210 ("Pashaie Property"). On August 19, 2022, my clients observed that
construction had commenced at the Touil Property, including major stucco and interior
demolition that brought the home to down to its studs in several locations.

          **We hereby demand that your client, Mr. Touil, and his agents, cease and
desist from engaging in any and all construction activities at the Touil Property, pursuant
Section 1 of the Slope Maintenance Agreement.**

          Specifically, the Slope Maintenance Agreement provides as follows: "Once the
improvements are constructed, Solimani **shall not change the improvements or their color
without Pashaie's prior written approval**." (Slope Maintenance Agreement, Section 1,
emphasis added.) Thus, the Slope Maintenance Agreement provides that once the improvements
contemplated by the plans that existed in 1992 were constructed, the owner of the Touil Property
may not change them without the Pashaies' prior written approval. The agreement requires the
Pashaies to approve even any changes of color to the Touil Property, let alone demolition down
to the studs, and a major remodel, which is what my clients personally observed on August 19,
2022. The Pashaies have not provided any written consent to any construction activities at the

August 22, 2022
Page 2

Touil Property, and do not intend to do so until they review and analyze your client's new plans to renovate the Touil Property.

To the extent that the new plans (which, again, my clients have not yet seen) are similar to those presented to my clients in 2017, those plans are unacceptable. At a minimum, the proposed pool from the 2017 plans violates the following provisions of the Slope Maintenance Agreement: "Solimani may construct a lap pool at, and parallel to, the property line of the Solimani Property adjacent to Sierra Mar Drive. The pool shall not be wider than 9 feet, not longer than 25 feet, and no deeper than 5 feet..." (Slope Maintenance Agreement, Section 1.) The proposed pool from the 2017 plans was not parallel to Sierra Mar Drive, and did not comply with the dimensions described in the Slope Maintenance Agreement.

Our clients will not hesitate to bring an action in the Los Angeles County Superior Court to enforce the Slope Maintenance Agreement if the need arises. As you know, the prevailing party in any suit brought to enforce the Slope Maintenance Agreement is entitled to recover attorneys' fees incurred in connection with the lawsuit. However, we are hopeful that our respective clients can meet and confer regarding the new plans for the remodel of the Touil Property, and come to an agreement regarding the proposed scope of work, without having to involve the courts. Please respond to me via email at ssamimi@jmbm.com by August 31, 2022 to arrange a meeting among our clients, so that the new construction plans can be reviewed and discussed. If we do not hear from you by August 31, 2022, we will proceed to file suit to enforce the Slope Maintenance Agreement.

Nothing in the foregoing is intended, nor shall be construed as, a waiver of any right or remedy accruing to the Pashaies either at law or in equity arising from these matters all of which are hereby expressly reserved.

Sincerely,

BENJAMIN M. REZNIK
SEENA M. SAMIMI of
Jeffer Mangels Butler & Mitchell LLP

# EXHIBIT 4



Seena Max Samimi
Direct: (310) 785-5344
ssamimi@jmbm.com

1900 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-4308
(310) 203-8080  (310) 203-0567 Fax
www.jmbm.com

September 6, 2022

<u>**VIA E-MAIL**</u>

Maurice D. Pessah
Pessah Law Group
9100 Wilshire Blvd., Ste. 850E,
Beverly Hills, CA  90212
310-772-2261
maurice@pessahgroup.com

> Re:   **Demand For Construction Plans, and Renewed Cease and Desist Letter Regarding All Construction Activities, Pursuant to Slope Maintenance Agreement dated October 1, 1992**

Dear Mr. Pessah,

This follows our August 22, 2022 Cease and Desist letter, and several follow-up phone conferences that you have had with my clients between then and now. My clients have repeatedly attempted to cooperate with you in good faith, and to come to a mutual agreement regarding the construction activities at the Touil Property, in compliance with the Slope Maintenance Agreement. However, the August 22, 2022 Cease and Desist letter was completely ignored (demolition and construction activities have continued, and have even been amplified), and it appears that your client is not only unwilling to comply with the Slope Maintenance Agreement, but is also unwilling to even negotiate with my clients in good faith.

Several times, my clients have requested that you provide the plans for construction at the Touil Property, so that they can review them pursuant to the Slope Maintenance Agreement. Those requests have been summarily denied. Instead, you have told my clients to merely "assume" that the plans are the same as the latest plans that were shared with them in 2017. For the reasons stated in the August 22, 2022 Cease and Desist letter, the 2017 plans are unacceptable in any event (mainly due to the pool design that does not comply with the Slope Maintenance Agreement), and my clients will not approve such plans. Furthermore, if the plans are actually the same as what was previously shared, there is no reason to withhold them. The lack of transparency regarding the plans is troubling, and leads my clients to believe that your client is both hiding something, and thumbing its nose at the requirements of the Slope Maintenance Agreement.

September 6, 2022
Page 2

       LAMC 12.03 defines a "Major Remodel" in the hillside area as: "Any remodeling of a main building on a lot in the Hillside Area whenever the aggregate value of all alterations within a one-year period exceeds 50 percent of the replacement cost of the main building." There is no doubt that the proposed remodel of the Touil Property satisfies (or more likely, well-exceeds) this definition, despite your client's blatant misrepresentation of the valuation of the project to the City.[1] Pursuant to LAMC 12.21.C.10, such a "Major Remodel" would trigger new development standards.

       I hereby demand that you provide all plans (construction, engineering, elevations, renderings, etc.) for the construction taking place at the Touil Property, **by noon on Monday, September 12, 2022. If you do not provide the requested plans by that time, we will contact the Code Enforcement department of the City of Los Angeles to report the full extent of the remodel project, and its gross undervaluation.**

       My clients would prefer to avoid litigation because they remain hopeful that they can meet and confer with your client regarding the new plans, and arrive at an agreement regarding the proposed scope of work. However, if you fail to cooperate with my clients (*i.e.*, providing the plans by September 12, and good faith negotiation of an agreement among the parties that complies with the Slope Maintenance Agreement), they will 1) report the undervaluation of the project to the City's Code Enforcement department, and 2) pursue litigation to enforce the Slope Maintenance Agreement (which, as you know, provides for recovery of attorneys' fees by the prevailing party).

       Nothing in the foregoing is intended, nor shall be construed as, a waiver of any right or remedy accruing to the Pashaies either at law or in equity arising from these matters all of which are hereby expressly reserved.

       Sincerely,

BENJAMIN M. REZNIK
SEENA M. SAMIMI of
Jeffer Mangels Butler & Mitchell LLP

---

[1] My clients have observed that about 90% of the structure has been demolished, including all of the exterior stucco and the roof structure, and most of the building has been brought down to the studs. The $300,000 project valuation does not even come close to the millions of dollars it will take to complete the remodel project.